All rise. The Illinois Appellate Corps 3rd Division is now in session. The Honorable Justice Jesse T. Reyes is presiding. Morning, ladies and gentlemen. Morning, Your Honor. All right, we're done. You call the case? Svec v. Retirement Board. All right, when counselors are going to argue this matter, approach the bench. Please identify yourselves for the record and what party you're representing. Good morning, Your Honor. My name is Brian Labarde. I represent the Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago. Okay, and good morning, Your Honors. I represent, my name is Jerry Martoni. I represent Beth Svec, who is the plaintiff and the appellate in this case. Okay. All right. Fifteen minutes apiece. One time for rebuttal? Yes, please. All right, how much time? Five minutes should be ample, sir. All right, and our colleague, Justice Bertino-Mankin, unfortunately cannot be here, but she will be listening to the tapes and she will also be participating in the decision in this matter. Okay? Okay, fair enough. Thank you. All right, thank you. All right, you may proceed. May it please the Court, my name is Brian Labarde. I'm the attorney for the appellant at the Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago. In some ways, Your Honors, this case is simple. In other ways, it's not. Well, why don't we start with the standard of review? All right, fair enough. Okay. So in your brief, you suggest that it's a manifest waste of de-evidence standard of review. Are there any factual issues that are in dispute? There are, Your Honor. And I know Mr. Marconi has suggested it should be a de novo review because it's only a legal question because both of the doctors that we have in this matter, the pension board's doctor, Dr. Lander, and one of the plaintiff's treaters, Dr. Thapar, both agree that she is disabled from ongoing harassment and retaliation resulting in her disability. The difference in the factual question in this case is Mr. Marconi would suggest that she is disabled as a result of her inactive duty, her police investigation of May 2016. Well, isn't it more so in terms of what constitutes the act of duty? Isn't that really what is issued here and which is in dispute? I think it's twofold. It is active duty certainly, Your Honor, but it's also an issue of causation. There's an issue of whether or not her disability, what was it caused by, number one, and number two, whether or not that rises to the level of an act of duty. Okay. And for those reasons, I think this is a factual inquiry based on the cases that we've cited, namely Miller, Kelly, and the Stickney case would all suggest that that defaults to a manifest way to the evidence standard of review because you're required to apply those facts to the case. Essentially, when the issue is why is this person disabled and what act caused it, that's fact. How do you define act of duty? Well, act of duty, of course, is defined by the statute, Your Honor, and, of course, it has to be an act of police duty rising to the level of special risk without a civilian counterpart speaking broadly. So in this case, there is a litany of events that are identified by both the plaintiff and the physicians suggesting that these are the events that resulted in disability. So, again, I think the court has a factual inquiry to determine, well, which of these events caused the disability? By the way, of course, there's no issue as to whether she's disabled, she received an ordinary disability benefit. That's not an issue in the case. So there's an issue as to which of these events caused the disability, and then once you identify that, does that event rise to the level of an act of duty? Well, don't you agree that the alleged harassment here was a result of her investigation on May 30, 2016? There is an implication that resulted in part, the harassment resulted in part from that investigation. Okay. I don't agree that the investigation in any way, shape, or form contributed to her disability. There's no medical evidence in the record that suggests she is disabled as a result of this gun investigation in May 2016. There is plenty of evidence in the record that talks about she's disabled as a result of harassment, both on and off duty, social media interactions, interactions at police funerals, difficulty obtaining a job, avoiding police officers in her neighborhood, where she lives in a very police-centric neighborhood is my understanding. So avoidance behaviors in that context. But doesn't that tie into the investigation? She has the investigation, then comes the whistleblower, a lawsuit, and then all these other activities start taking place and she feels at risk on her job. So you hit the nail on the head. There is very much a question of where do you draw the line here in terms of causation? And that's, I think, central to the case. And the case that's cited in our brief and what we would suggest specifically, the Robbins-Illinois Supreme Court case, suggests that there's no but-for analysis in a police mental disability case. So the suggestion that but-for the gun case, these other things that resulted in disability would not have happened, is not the proper inquiry. The Robbins court would tell you you have to have a specific identifiable act of police duty that resulted in disability to rise to the level of an active-duty disability. And here what you have is this litany of events that occurred up to a year after the gun case in 2016. And following the gun case, there's plenty of facts in the record that suggest she was reassigned, she was assigned to a different shift that she didn't want, she had difficulty working with her coworkers, she received poor employment evaluations, things of this nature that contributed to her disability. But she worked for an unrestricted duty from the May 2016 investigation until December of that year when she left because of an unrelated injury not related to her mental disability. It was some sort of physical injury, a fall, I think. She's then off-duty because of this fall, not related to the disability she's claiming here today, and then eventually returns to duty, is released to full duty in April of 2017, so nearly a year after the gun case investigation. She works a short period of time in 2017 and then is ultimately off-duty due to the disability, which brings us here today. What about the fact that we have a jury here that actually found that there was enough to establish that she was on duty or on active duty and then as a result was harassed and then ended up having all these psychological and mental issues? So two things on that. Of course, you're referring to the recent appellate decision by this Court on the whistleblower case. The first thing is the issue of active duty, of course, was not at issue in the whistleblower case. That's a specific inquiry under the pension code. That's not something dealt with in her whistleblower lawsuit or by the Whistleblower Act. In order to have that line of duty, you have to be, it isn't sufficient to simply be on duty and in uniform. Again, you have to have this specific act of police service that the general public would not participate in that rises to the level of special risk. The interesting thing, and again, there's no question that she's disabled and that it's the result of several things, including the harassment, as the Court in the whistleblower case found. But it's also the result of all these other instances that are identified in the record that were not necessarily workplace harassment but may have occurred outside the context of work. But again, just because it occurred related to work does not mean that it's an act of duty. Interestingly, the appellate court in the whistleblower case, you know, did find that she didn't have stress as a result of her retaliatory conduct. That was a finding that the appellate court made in the whistleblower case. And that supports the pension board's position that, look, she had this May gun investigation. She continued to work for a period. She went off for a period after that due to an unrelated injury. This was not the cause of her disability. The cause of her disability is this litany of other things that occurred. And she's certainly entitled to a disability and received one, but it doesn't rise to the level of an act of duty. Going through, again, talking about causes of disability, which is one of the things I think that makes this case a little bit more complex, is there isn't one single identifiable cause. It isn't an easy case. There are a whole bunch of causes identified by both the plaintiff and by the two doctors in question. So looking at my notes from what is a rather voluminous record, the things that have been identified by either doctors or the plaintiff are her transfer to a different police district, difficulty interacting with other officers, both at work and off duty. She received poor performance evaluations. She wasn't called out for hostage situations, which is a special assignment in the police department. She ceased being called out for those. She was assigned to the midnight shift, even though she had requested a day shift. She was called a whistleblower on the floor of the detective division at CPD. And she was exposed to disparaging comments on social media platforms, all related to her report of May of 2016. And the May 2016 report, you know, it's important to notice, she returned to the police station having conducted an on-scene investigation, essentially, where she discovered that the version of events given by arresting officers did not necessarily agree with some cell phone video that she reviewed. She reports this to her supervisors. Her supervisors say, call the state's attorney's office anyways, we want to get felony approval. The state's attorney's office says, is there video? She says, yes. The state's attorney's office says, does this support the version of events? She says, no, it doesn't. At that point, the investigation into the officer's arrest is no longer conducted by SPEC. It's conducted, the state's attorney's office calls the Bureau of Internal Affairs, and they open an investigation. In that context, she's simply acting as a witness. So she's interviewed by the Bureau of Internal Affairs about what happened, what did your investigation discover. She's not investigating the two officers. She had been investigating the underlying gun crime, which was not approved for charges by the state's attorney's office. The other things that are noted in the record in terms of causes of disability, simply anxiety. She has a fear that the department is going to, quote, screw her over even more. These are things that are repeated in the record to both her therapist as well as the pension board's doctors. She is ongoing concerns about legal issues, which I assume refers to what at the time would have been her pending whistleblower case. She's concerned about retaliation. She has anxiety about being around coworkers. She's concerned she's going to be sabotaged, is the word she uses, sabotaged by other police officers because of what happened in her gun investigation. But again, the Robbins case would tell us that the line of duty disability due to stress has to be the result of a specific act of duty unique to police work. The only way you get to line of duty here is you have to engage in this prohibited but-for analysis. But for her police investigation in May 2016, the following things would not have happened. And both the Robbins case and the Kelly case tell us that's an analysis for proximate cause in a negligence matter. This is a statutory action that has a statutory definition for active duty. Proximate cause doesn't enter into it. You have to have a single identifiable instance of duty to identify for your disability. And that simply doesn't exist in this case. And Robbins, factually, we have a little bit of a difference because the Supreme Court indicated that stress was generalized. Here we have more of a specific act of police duty. There's an investigation, and the allegations then result that, you know, you've got the whistleblower case, and then you have Ms. Beck here suffering from psychological, physical, and emotional distress. Whereas in Robbins, you didn't have that connection. It was just a bunch of other things that were occurring, a lot of generalized pressures that were perceived. And as a result, the officer in that case felt that, you know, he was entitled to relief or benefit. But here we have more of a more specific act that we can look at and say, you know, this is what resulted. Yeah, I would suggest that this is similar from Robbins with the generalized anxiety. Because, again, you have no medical evidence that says she's disabled because of the gun investigation. You have evidence that says she's disabled from all the things that occurred thereafter, over the period of nearly a year while she was both on duty and off duty. And so those are things that I would classify as generalized police stress, poor performance evaluations from your supervisors, inability to get along with coworkers, being assigned to a shift that you didn't want to do, not being called out to the assignments you prefer. These are generalized stressors that would occur in any job that is not necessarily specific to police duty. Under Robbins, do you have any other authority to rely on your argument? Well, I think the Kelly case would support the same analysis as the Robbins case. The Robbins case, of course, is the seminal case from the Illinois Supreme Court. But in the Kelly case, I think you had a similar situation. And, in fact, in Kelly, I would say this is even a stronger argument than Kelly because in the Kelly case, you had at least one doctor who found this disability in Kelly is solely related to an act of duty. Another, the pension board's doctor said it wasn't, but you did have one doctor there that said that. And the court still found, no, this does not rise to the level of an act of duty, this is a non-duty. In this case, you don't have any doctors that say this is solely related to an act of police duty. You have, again, this litany of things that occurred, and no doctor in the record says she's disabled as a result of her police gun investigation that didn't result in charges in May of 2016. That doesn't exist in the record. One other thing I would touch on briefly, if I may, Your Honors. So the Stickney case, very quickly. I know my opponent will touch on that, I'm sure. He suggests that Stickney stands for the proposition that the court has already found that whistleblowing is an act of duty. And I would suggest the Stickney case does not hold that. Stickney was materially different in a number of instances. Number one, in Stickney, the whistleblowing, so to speak, resulted in an interference of that officer's police work. He was unable to perform his police duty because of the interference of his supervisors after he reported incongruities with the evidence locker, essentially. That didn't happen here. There's no evidence that at any time Speck was unable to perform police duties as a result of this. The other big difference in Stickney is, in Stickney, all three doctors that the pension board retained said, this is a line of duty disability. So causation was not discussed by the Stickney court at all. Whereas here, this is very centrally an issue of causation, and that simply didn't exist in Stickney. The other thing with Stickney is you have evidence that the officer had these panic attacks that he was ultimately disabled from prior to the whistleblowing activity in Stickney. So the court tied his panic attacks to his undercover narcotics work, which clearly is an act of police duty no matter who's analyzing it. You don't have that here either. So for those reasons, I would say that Stickney is inactable as well. I'm happy to answer any of the questions, but I reserve the time I have left for rebuttal if I may. I would simply ask you this. If we peel away the layers of the artichoke to get to the heart of the matter, it is your contention then that what we are tasked with doing here is determining whether or not that the whistleblowing incident was the cause of the plaintiff's. And because of these other actions, what Justice Reyes has described as things that flowed from this, it is your contention then that those are the causes and it's not this single cause that the plaintiff relies upon. That's correct. And we would go even further and would say that there's no evidence to suggest the gun investigation was a cause at all. It was a slitany of other things. And this but-for analysis, which, again, Robbins will tell you you can't do, is extremely important in this case. Because if you buy into the plaintiff's argument and say but-for this gun investigation, the following things wouldn't have happened. Yes. Then where do you draw the line? How far do you stretch that twine of causation? Because pension boards are going to be unable to figure out, well, this happened a year ago and then all these other things happened. How are we to analyze this to determine whether this rises to the level of an act of duty or not? And I would suggest that's exactly why Robbins says you don't engage in that sort of analysis in this case. It has to be a specific identifiable instance of duty, which you don't have. Very good. Thank you. Thank you, Your Honor. Thank you. May it please the Court? Good morning. Good morning. So before you start, I'd like to address, have you addressed the standard of review issue? Yes. All right. Now, you propose or you're arguing a less deferential standard of review than the board does. But given the fact that injury was alleged to have been, you know, a specific act and that we have the jury also indicating that, you know, it's there as well based on their verdict, so are we really dealing with a manifest weight of the evidence here? So the way I look at it, an act of duty is a term of art. That is statutory. It's defined in the pension code. So if you're just looking at that, you could say it's a de novo review. However, what you have to do here is take this set of facts, apply it to the law to determine whether or not she engaged in an act of duty. I think that's what makes it under the clearly erroneous standard of review, because the facts are not disputed. They're really not. I mean, nobody is saying that this didn't happen on the street. Nobody is saying she was not a whistleblower. Nobody is saying she's not disabled. And if you go through the board's decision, we haven't argued any facts. The argument here is what the board is arguing is that she did not engage in an act of duty, and that's a statutory term, and that's where you have to look at all the line of cases under act of duty starting with Johnson and going all the way down to the last one I think they cited was Kelly. So I think, and speaking of Kelly, Kelly applied a clearly erroneous standard of review, and that's the case that they cited in their reply brief. So it gets a little confusing, I think, in the case law, but for the most part all of these cases that have dealt with whether it's an act of duty have applied the clearly erroneous standard of review, which is less differential than the manifest way to the evidence. I understand why they want to use the manifest way to the evidence, because they want to say, you know, it's not for you to decide. It's for them to decide because they're the arbiter of the facts. So if we were to follow your logic here, what weight and penny do we give the jury's verdict in the Whistleblower case? Well, I think the jury's verdict is very telling in the Whistleblower case, because obviously, and I wasn't there at the jury trial. I've read the public court opinion. You know, they looked at the case, and assuming they had to make a determination as to whether or not to award damages to Officer Detective Speck on account of her, the trauma that she went through and the emotional distress that she went through, which was based on the retaliation from the whistleblowing activity. And I think we have to keep in mind, too, and I think this is important with regard to that definition of active duty, because it talks about where it's imposed upon a police officer by the statutes, not ordinarily assumed by a citizen in the ordinary walks of life. You have a police, you have a detective here who is out on the street doing her official duty and investigating gun cases and saw that other officers on the street were fabricating evidence. And she saw that in the cell phone video. She learned that through talking to the witnesses. She learned that through talking to the officers. And I think in her testimony, she said at that moment, once she decided to come forward, she knew her career was going to be in jeopardy. Because of the fact, now you have a decision to make. Do I turn against my fellow officers who I've seen engaged, I would say in illegal conduct, at the very least misconduct by suborning perjury, or do I just look the other way, go on with life, everything will be easy, and that's it. She chose at that point to try to stop it at that point. You've got to remember, she didn't first go to the state attorney's office. She went to the supervisors and said, listen, this is the evidence I've garnered from my investigation. We can stop this now. And the lieutenant said, no, no, no, you call the state's attorney. Because as a state's attorney, you have to call to get felony approval. So even her supervisors were getting on her to say, you make that call. You call that state's attorney's office. We want felony charges against these individuals. And at that point, and Mr. Labarge brought it up in his argument, she was truthful with the felony review assistant and said, you know, they made this arrest. They've got this gun. They're saying that one of the officers was battered. However, there's cell phone video, and I watched it. So the assistant state's attorney at that point did the right thing and did not approve the charges. I'm assuming they went in as a misdemeanor, but I think at the end of the day, the right thing happened in terms of integrity, and the right thing happened in terms of making sure that there wasn't a conviction or a prosecution of an innocent person. So then it becomes, so none of that is in dispute. I mean, the board in their decision has never said that she was exaggerating. You've read Dr. Landry's reports. She did a lot of testing as far as trying to make sure that SVEC was giving her a true story and not engaging in symptom magnification or malingering. And if anything, Landry said she was underreporting what was going on with her. So none of that is in dispute. And if you look at the board's order, and this is, it's unusual that they're coming forth now and saying that there's these separate causes, and they're trying to analogize it to Miller. And I know Miller very well because I litigated Miller against Mr. Lovardi's firm. And Miller's very, very different because Miller had at least five distinct calls that he went on that were very traumatic. He was just served with divorce papers, and he went to Manhattan, and he was threatening to kill himself in a bar, and he almost got shot by the Manhattan police. He was a Marine with PTSD. So there was a lot of stuff going on with Miller. And I think the court said that you can't, you need a specific identifiable act of duty. In his case, they were on different days and different things. Here you have one. And if you look at the pension boards, even their decision in order, one section in their decision is entitled the May 30, 2006 injury. They have a whole section of their decision relating to that subject, the May 30, 2016 injury. And then they go on, even in their analysis section, on the record on page 35, her disability resulted from a culmination of negative occurrences and or interactions related to her whistleblower case for history with CPD. They go on in paragraph 19 of their decision. They said she never returned to CPD due to her ongoing depression, stemming from the 2016 arrest investigation. This is not me paraphrasing. This is the board telling you what they found. They do cite the Robbins case. And, Justice Reyes, you brought up Robbins. And I point out in Robbins, and I brought it up on my computer, the board doctor in that case said that while Robbins' stress was related to his police work, the stress was not connected to any specific act of Robbins as a police officer. And another expert said that Mr. Robbins' past exposure to occasional violence was not problematic for him. And then basically it was related to his anxiety over job performance. I don't know if he got passed over for promotion or whatever, but that's what Robbins is all about. Robbins is not saying that they're trying to argue in this case. It's like, oh, well, okay, he's, you know, she was harassed. She has these bad relationships now with her supervisors, and that's the source of it. You have to remember, and you've got to think from what Speck is going through, she did what she felt like she had to do by making it. Immediately she starts getting harassed. Immediately she's taken off, taken out of the gun unit. The commander with Nikki, who was a defendant in the lawsuit, was a trustee on the pension board. So now as she's going through this, you have the person, now you're commander now, and she's not thinking disability pension in 2016 or even 2018. But you have a lot of people then that got together that started making her life miserable. And, of course, you read the transcript of the civil trial. The jury didn't take kindly to what they did to her either because they gave her a very large sum of money, and it was based upon what she went through in the retaliation. In this case, and to go on with the board, and I'm quoting from the board's order, claimant suffered a psychological injury in or around May of 2016. The objective medical evidence shows claimant has undergone multiple treatments for her psychological injury. Dr. Landry, the pension board's independent medical examiner, concluded claimant is disabled from returning to duty in any capacity based on her psychological condition. And then they go on to say, in her IME report of April 13, 2018, Dr. Landry described how claimant was injured on May 30, 2016, after being subjected to extensive retaliation for involvement on a case that turned into a whistleblower lawsuit on her part. So you can't separate, and what they want to do is they say, well, she's not disabled because of the gun investigation in and of itself. Well, when you look at all the case law, none of the officers where they found a line of duty was disabled as a result of the specific investigation. Look at Officer Jensen, the Supreme Court case. He's walking across the street. He's technically sort of in an investigation because there's a call for help from a citizen, and he falls down. Well, they didn't separate that out and say, okay, well, we have the investigation where he had to respond to the citizen, but then we have this other thing where he fell down. Look at Elm, and they cite Elm. Elm's riding a bicycle. There's not even a traumatic event. After riding this bike for a period of time, his knee goes out, and he becomes disabled. Well, he's riding a bicycle. And the court said that because in the capacity in that he was working, he had to keep his attentions directed elsewhere, and that was a line of duty pension. Jones that they cited was an automobile accident. Well, what, you know, he's on routine patrol. So what the court is looking at, what capacity was he acting? He was on routine patrol, and then what happened? He got in an accident. Well, that's what happens to Svek in a way, right? She's doing this investigation, and then she gets run over by the police department, who decides that because of her truthful reporting of something she sees on the street, now we're going to make your life miserable. You can't separate the two. Well, what they're arguing, from what I understand, is that Robbins requires a more direct connection between the act of duty and then the injury. And so if I understand or I don't understand it, there was gaps or there was a length of time before you could actually say one was related to the other. But that's not what their decision in order says, because they say it's from that day, from that injury, and then it's extensive retaliation. So there's no gap here. You know, and you've got to remember, too, there's nothing before May 30th. This isn't a situation where it's an officer that's had ongoing issues in the department. She's been disciplined. She's a beefer, files a lot of grievances. Nothing. She loved her job, loved doing what she was doing, was promoted, had no problems whatsoever until she decided to make her complaint against fellow officers. That's when it all started. And it doesn't stop. And if you read Landry and even Judge Loftus, when she was doing the arguments, she's like, well, you know, one of her questions, well, was she supposed to go off work the first day in order to be entitled to a pension, you know, on the day after she gets harassed? The thing is, is that, and it's clear in the record, Detective Speck stuck it out. She tried and tried and tried. And Dr. Landry's report says that, too. She wanted, she didn't want to go off on disability. Not at all. And I think it was until she fell in December of, I think it was 2016, at home, she went off and her doctor said, hey, you don't seem, you seem off. And that's when they referred her to a mental health professional. And that's when she gets into the counseling with Baxter, which then leads to VAPAR, and then an ongoing treatment. And at that point, it was determined that she couldn't come back to work. And then it doesn't, none of it stopped. She did decide to file a lawsuit that exacerbated things because of the fact now you have a lot of people that are mad that she's trying to get money from the city. But that's more attenuated, but I don't think that's the main, where everything came from. It was right away when they took her off, took her out of the gun unit, put her on midnights in the 7th District, took her out of the area because none of the officers wanted to work with her. She was afraid of getting shot, which, again, I think makes this very different than, and they brought up in their briefing, well, you know, if you're working for a company, you know, when you get retaliated against, you can file something under the Illinois Retaliatory Discharge Act or whatever the name of it is. But you're a police officer, and you're working in this paramilitary organization, and it's dangerous, and backup is key. And if you don't have partners that are going to back you up, she certainly is well-founded in her fear that she's in danger. Well, what about their argument regarding Kelly? They said, well, if you don't agree with Robbins, right? So look at Kelly. So Kelly, he gets in a shooting, I want to say, in April of 2014. I want to say he shoots and kills someone. Now, you would think if that was a traumatic event, you would start getting treated, or there would be something right after that. Nothing for three years. Nothing at all. No treatment. Nothing. He has some stuff that predates the 2014 shooting, and then the jury verdict comes down against, I think, the Department of Human Services in 2017, and then all of a sudden. Now, the big thing in that, which I think you have to remember, is that the board doctor said that there was no disability from that 2014 shooting. You had medical evidence, I think, undisputed, or at least the board could rye upon that, and that medical opinion that he did not suffer from PTSD as a result of the shooting was backed up by, I think, the objective evidence where he didn't complain of anything for three years. So there was evidence that supported the board's decision in that case. I don't think that's anything like SVEC, where their expert, their IME, is saying it's related to the campaign of harassment against her. And, you know, the same with the Stickney case. You know, you had an officer who, I think, is the chief, where he was doing fine, the chief died, Z-Tech came in, I think Z-Tech worked for Chicago, came into Stickney, and then Officer Hare started complaining there's drugs gone and money missing from the evidence locker. There was problems with a rape investigation. So he started to bring all this forth, and the chief was telling him to shut up, and then it became too much for him, and then the court opinion went into the treatment that he was receiving. Now, granted, and not that dissimilar to this case, the three doctors, because it's a suburban case, they required three doctors, said that he was disabled and it was probably line of duty. But those doctors, I get it that they're saying it's connected, but they're not making a legal opinion at that point, whether it's an act of duty, they're not asked to do that, they're just saying it's related to his job. So you have to look at this court's reasoning under there, and I'll quote under Stickney, it says, we believe Hare's comment must be taken in context with the events that gave rise to it. The interactions with Z-Tech, who was the chief, occurred in the context of Hare's police duties, managing evidence, investigating crimes, and conducting undercover operations. Same thing here. I mean, you have Z-Tech, who's investigating a crime, so all of her communications with their supervisors were in the context of police work. It's not something that happens outside of that, like some of the cases that they cited. You know, and I've already talked about Miller. Everything that happens here is connected to that May 30, 2016 whistleblowing. You know, I also brought up the fact, in the briefing, you know, there is a public policy aspect of this case. I mean, you have a situation where I think the Stickney case strongly supports that she was engaging in an act of duty. But you would hate to see a case out there that would signify or telegraph to other officers, hey, if you open your mouth and you see something wrong, whether it's police brutality, whether it's financial fraud, whatever, be careful. Because if you are retaliated against, you can't look to the pension code, you can't look to the pension board for any relief, because of the fact it's not an act of duty. It's kind of telling, I think, officers, you're on your own. You know, we're not going to protect you. And I think that's a bad message. I think the jury in the civil case sent a message. And again, I wasn't involved in that civil case, but it seems like they sent a message. No one likes to see what happened in this case. No one likes to hear about police framing individuals, innocent people getting convicted. And that could have easily happened in this case, had detectives opened her mouth, did the right thing at the time, and she paid the price for it. So in this, you know, I think it's an act of duty. I think she earned disability benefits, which, because of the fact they gave her ordinary, expired, I want to say, December 28th of 2022, so she's done. There are no benefits for her. And I'd ask the court to affirm, to reverse the board and affirm Judge Loftus, who obviously reversed them on administrative matters. And if there's any other questions, I'm more than happy to answer them. Thank you. A brief rebuttal, Your Honor, if I may. I guess the first thing I'd like to note is no one is here suggesting or attempting to defend what happened to Detective Speck. That was dealt with in the whistleblower case. And, you know, obviously her actions were admirable. And no one is here from the pension board suggesting that what happened to her in her employment context was somehow fair or correct. I want to respond to the public policy argument that Mr. Marconi brought up at the end. Let me interrupt you, though. What you are saying, though, is that what happened to her was not her injury were not as a result of her whistleblowing. Correct. Correct. And I think, as Mr. Marconi brought up in his argument, if you're going to say that the injury was this May 2016 gun investigation, then how do you explain that she didn't seek any treatment and she continued to work full and unrestricted duty for a period of six months thereafter and only stopped when she injured herself by falling? So if you're going to point to that incident, I think you have a real nexus problem. She returned to duty thereafter. She repeatedly, if you look at the whistleblower decision, it talks about how she repeatedly attempted to return to duty during the period that she was off duty. Her doctor released her to full duty. So, again, if you're going to say this is a single identifiable incident and the incident is the May 2016 gun investigation, I don't know how you explain her returning to duty and her repeated attempts to return to duty thereafter. But it seems to me that that argument ignores the fact that an individual may be, and I'm speaking in the hypothetical, although we could make reference to counsel's case of counsel brought up regarding the bicycle, but we can certainly picture a scenario where one is injured but doesn't think that one is seriously injured and then later this injury manifests itself in such a way that we are then able to trace back to the original injury and say, ah, here is the cause of that injury. Of course, yeah. So I would suggest two things. Number one, I don't think the physical cases that were cited by counsel are applicable. If you look at the case law in this area, mental disability cases are treated differently than physical disability cases. And the bicycle case and these other cases and Johnson walking across the crosswalk, those are all physical cases. And certainly you can have a physical case where you hurt your knee on a bicycle and then years later it becomes symptomatic and, aha, it was a bicycle incident from years ago. But again, in this case you have multiple incidents. So just like the Miller case, and the Miller case was multiple responses, as Mr. Marconi pointed out, but in this case you still have multiple instances of harassment, again, both on and off duty, at the workplace, outside of the workplace, while she's with the PD, while she's on leave from the PD, after she's left the PD, on social media, at police funerals. These are all multiple instances that caused her disability. And certainly mental cases are much more difficult to analyze than physical cases as a result, which is why we're here today. It's true. I agree. But again, I would suggest the physical cases are not applicable to analyzing a mental disability case for the reasons that we've discussed. And again, in this case, no doctor. I really brought that up to you to highlight the similarities or the differences that you mentioned earlier when you spoke about where do we draw the line, I believe you said. And it seems to me that it is feasible, possible, reasonable, that an injury can occur, be it mental or physical, and that it not manifests itself for some time. I was involved here as a justice on a case, a mental case, where it was a particular incident, and it manifests itself sometimes, sometimes later. So it seems to me to be reasonable. And to that, you respond. It is reasonable, and that can happen. And I think medicine would tell you we can't be so precise as to say necessarily exactly this is when it occurred. But again, as was the case in Kelly, where you had a delay in a sense. You had an incident and then a delay. The court in that case found that, well, yeah, there was a delay, and that is one of the many factors that we consider in determining causation, is a delay in seeking treatment. And again, in here, you have not just the delay, but all of these intervening causes. So, you know, counsel pointed out in the Kelly case, there was one doctor that said, well, this person isn't disabled from the shooting incident. I think you have something similar here. You have no doctor that says she is disabled as a result of the police investigation. And if you're going to say that the investigation harassment rises to the level of the act of duty, again, how far do you stretch that line of causation when she has all these other issues she's discussed regarding police assignments and employment evaluations and things of this nature that the case law would tell us are generalized and not specific to police duty. Any person who is in employment can have problems with their supervisors and issues with employment evaluations and things of this nature. So to tie those all back to an incident that, I mean, even if you look at the record and you look at the affidavit that she submitted in support of her claim for disability to the pension board, she says she's disabled as a result of harassment. She doesn't say she's disabled as something that occurred during her gun case. She says it's the harassment. So I would suggest that the facts, the passage of time, and the multiple incidents of what would take this out of the line of duty area. And you have to ask yourself, where was the harassment from? What was the genesis that created the harassment and the promotion? Well, I think you again go to causation. She would suggest that the harassment was a result of her reporting related to the gun case. Obviously, there was a whistleblower case that found there were adverse actions upon that. But again, I would suggest that the real question is, well, did that cause the disability? The cause of the disability was the officer's treatment of her subsequent to that, not the act of investigating the case, which went away shortly after May of 2016 when it wasn't charged, is my understanding, and the case simply went away. So again, it's a difficult case because you're stretching that bungee cord of where does it fall in terms of the line of causation. And, you know, doing a huge amount of this type of work, pension boards will be difficult for them to determine how do we draw the line in determining whether this officer should get a line of duty or a non-duty disability when you have A, a gap in reporting and treatment, and B, all of these multiple instances. And to that point, again, as far as the public policy is concerned, certainly there should not be a public policy against doing what officers expect it. That should be encouraged. But there is relief available around that. The whistleblower case is the relief that's available under a public policy argument to someone who does the right thing and is retaliated against. There's relief available. She did that. The issue about she's concerned that she isn't going to be backed up by other officers, you know, that doesn't rise to the level of an act of duty either. It's simply a perception or a fear that something may or may not happen is not an act, let alone an act of duty. There's no suggestion in the record that some officers told her, hey, if you're ever in trouble and you call in, I'm not responding. The perception or the fear that that may occur doesn't get you to the line of duty. And again, there is relief available to her under the pension code. It was the non-duty disability that she did receive. But isn't fear really based on perception? You know what, you may fear I may not and vice versa because of our perceptions of the situation? Certainly. So now I think you get into is it a reasonable fear? On what is this based? There's no evidence in the record to suggest that fear of not being backed up or fear that I may be shot in my squad car is reasonable. There was no suggestion that anyone suggested that to her, that someone told her that that would happen or that the department wasn't going to back her up. There isn't evidence in the record to suggest that that fear would be reasonable. The last thing that I would note is the Stickney case. Again, we're talking about communications in the context of police work. In the context of police work, I would suggest does not rise to the level of active duty. In this brief, I think Mr. Marconi frequently conflates acts of employment with acts of duty. Those are two very different things. Simply something happening at work related to your employment does not rise to the level of an act of duty. And again, the cases, the things that we're complaining about here, performance evaluations, reassignment to shifts, and again, stuff that happened off duty on Facebook or at bars and so on, are not acts of police duty. These are acts that occur in an office, you know, where you're assigned to a shift you don't want, or you're demoted to a different job. Those are not specific and related to police work. With that, Your Honors, unless anyone has any questions, I think that's all I have. We would ask that you reinstate the decision of the Pension Board reversing the decision of the Circuit Court awarding a line of duty disability. Thank you. Okay, thank you very much. As I mentioned earlier, our colleague, Justice Lankin, will be listening to the tape, will be participating in the decision that we render in this case. I want to thank counsels for a very interesting matter and a well-argued matter, and we will take this under advisement. Thank you very much. I echo Justice Reyes's comments, both of you gentlemen. Very good presentation. Thank you.